# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ALISSA JUECH,**

        **Plaintiff,**

    **v.**                      **Case No. 15-CV-1482**

**CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC. and CHILDREN'S HOSPITAL OF WISCONSIN, INC.,**

        **Defendants.**

---

## DECISION AND ORDER

---

### 1. Facts and Procedural History

Plaintiff Alissa Juech has been deaf since birth and communicates primarily through American Sign Language (ASL). (ECF No. 46, ¶ 1.) On the morning of February 5, 2015, Juech took her approximately 3-month-old son, B.J., to the emergency department of Children's Hospital of Wisconsin. (ECF No. 46, ¶ 35.) Juech's mother arrived at the hospital at roughly the same time, and Juech asked her to request the hospital provide her with a sign language interpreter. (ECF No. 46, ¶ 36.) Juech had been to Children's Hospital roughly 10 times before and had requested a sign language interpreter on each of those prior visits. (ECF No. 46, ¶ 28.)

It is Children's Hospital's policy to provide interpreters upon request, and it informs patients and families of the availability of interpreters. (ECF No. 46, ¶¶ 17-19, 21.) It is the hospital's policy to obtain an in-person interpreter if one is available. (ECF No. 46, ¶ 13.) If an in-person interpreter is not available, the hospital will provide a sign-language interpreter through video remote interpreting (VRI). (ECF No. 46, ¶ 22.)

Children's Hospital initially used VRI—essentially a live web cam—to communicate with Juech and to obtain B.J.'s medical history and chief complaints. (ECF No. 46, ¶ 39.) According to Juech, hospital staff did not know how to set up or use the VRI. (ECF No. 51, ¶ 120.) According to Juech, "[t]he VRI device was rarely utilized during B.J.'s treatment because Children's Hospital staff did not know how to set it up or use it." (ECF No. 51, ¶ 121.) She alleges that "[t]he VRI device took several minutes to start up … [and] froze constantly." (ECF No. 510, ¶ 121.) In one instance, Juech used the VRI device while breastfeeding her child, a task she found "exceedingly difficult … because she was forced to stand in order to see the machine and sign at the same time, all while holding her child." (ECF No. 51, ¶ 127.) The hospital then used an in-person interpreter while B.J. continued to be treated in the emergency department; this interpreter also provided services after B.J. was moved to a nursing floor. (ECF No. 46, ¶ 43.) Hospital staff informed Juech that B.J. may have a respiratory virus and that he should stay overnight for observation. (ECF No. 46, ¶¶ 44-45.)

Later that evening Juech's husband arrived at the hospital and the Jueches were informed that B.J. would be moved to the pediatric intensive care unit. (ECF No. 46, ¶ 50.) This discussion occurred with Juech using an interpreter through VRI, and her husband does not recall the VRI posing any difficulties or Juech having any questions or concerns that were left unresolved. (ECF No. 46, ¶¶ 50-51.)

At other points during B.J.'s hospitalization Juech communicated with medical providers in writing—for example, by way of messages typed on a phone and then shown to the recipient, or by handwritten notes. (ECF No. 46, ¶¶ 68-71.)

An in-person sign language interpreter was present when B.J. was discharged from the hospital on February 7, 2015. (ECF No. 46, ¶¶ 60-61.)

Two years later, in February of 2017, Juech returned to Children's Hospital with her four-month-old daughter, A.J. (ECF No. 46, ¶ 76.) The hospital provided her with an interpreter through VRI. (ECF No. 46, ¶ 78.) Hospital staff obtained A.J.'s medical history from Juech, although Juech does not recall if it was done using the VRI. (ECF No. 46, ¶¶ 79-83.) A physician later obtained A.J.'s medical history from Juech by way of the VRI. (ECF No. 46, ¶ 92.) Although Juech does not recall how it was communicated to her, she understood that A.J. would be admitted to the hospital for observation. (ECF No. 46, ¶ 88.) Juech requested an in-person interpreter for the following day (ECF No. 46, ¶ 88), stating that the VRI does not work for her (ECF No. 46, ¶ 94) and that she preferred in-person interpreters for questions, rounds, and

especially discharge instructions (ECF No. 46, ¶ 96). An in-person interpreter was provided at A.J.'s discharge. (ECF No. 46, ¶ 107.)

Juech brought this action alleging that Children's Hospital and Health System, Inc. and Children's Hospital of Wisconsin, Inc. (collectively, "defendants" or "Children's Hospital") violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 *et seq.*; § 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794; Wis. Stat. § 106.52; and the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18116(a). (ECF No. 1; *see also* ECF No. 28 (amended complaint).) Specifically, Juech alleges that the defendants "failed to provide her with the auxiliary aids and services required to enable effective communication during the hospitalizations of her two infant children in Children's facilities." (ECF No. 45 at 1.)

## 2. Relevant Law

### 2.1. Americans with Disabilities Act

Under the Americans with Disabilities Act, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). A hospital is a place of public accommodation. 42 U.S.C. § 12181(7)(F).

A hospital discriminates against a disabled person if it fails

to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(iii); *see also* 28 C.F.R. § 36.303(a) and (c)(1) (stating that a hospital must "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities").

The term "auxiliary aids and services" includes … [q]ualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing.

28 C.F.R. § 36.303(b)(1); *see also* 42 U.S.C. § 12103.

The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way

as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 36.303(c)(1)(ii). In other words, "[w]hether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment largely depends on context, including, principally, the nature, significance, and complexity of the treatment." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012).

Thus, a hospital is not necessarily required to provide whichever auxiliary aid a qualified person requests. *Majocha v. Turner*, 166 F. Supp. 2d 316, 323 (W.D. Pa. 2001); *Godbey v. Iredell Mem'l Hosp., Inc.*, No. 5:12-cv-00004-RLV-DSC, 2013 U.S. Dist. LEXIS 117129, at *23-24 (W.D.N.C. Aug. 19, 2013) (citing *O'Neil v. Tex. Dep't of Criminal Justice*, 804 F. Supp. 2d 532, 538 (N.D. Tex. 2011)); *see also Biondo v. Health*, No. 15-CV-362-FPG-LGF, 2018 U.S. Dist. LEXIS 60789, at *9 (W.D.N.Y. Apr. 10, 2018) ("Patients with disabilities are not entitled to the auxiliary aid of their choice unless it is necessary to ensure effective communication.") (citing *Bravin v. Mount Sinai Med. Ctr.*, 186 F.R.D. 293, 302 (S.D.N.Y. 1999)). "While qualified sign-language interpreters may be the only effective communication option for some, there is no per se rule that such interpreters are necessary, and other accommodations are often sufficient." *Godbey*, 2013 U.S. Dist. LEXIS 117129, at *20-21 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 208, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) (holding that sign-language interpreters are not required when lip reading, or by extension other accommodations, are sufficient); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 827 (D. Md. 1998) (noting that neither the case law nor the

regulations establish a per se rule that sign-language interpreters are necessary in hospital settings)). The hospital might appropriately conclude that some other means, including the use of written notes, is appropriate under the circumstances. *Godbey*, 2013 U.S. Dist. LEXIS 117129, at *23-24.

A hospital cannot require a deaf person to provide her own interpreter and, aside from emergencies or when the deaf person requests it, cannot rely on a person accompanying the deaf person to serve as a translator. 28 C.F.R. § 36.303(c)(3).

> A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides—
>
> > (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;
> >
> > (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;
> >
> > (3) A clear, audible transmission of voices; and
> >
> > (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

28 C.F.R. § 36.303(f).

### 2.2. Rehabilitation Act

Similarly, under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a). A "hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c). This includes an obligation to provide necessary auxiliary aids, which may include an interpreter. 45 C.F.R. § 84.52(d)(1), (3). "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

### 2.3. Wis. Stat. § 106.52(3)(a)1

Wisconsin law prohibits any person from "[d]eny[ing] to another … the full and equal enjoyment of any public place of accommodation or amusement because of … disability …." Wis. Stat. § 106.52(3)(a)1.

### 2.4. Affordable Care Act

Finally, under the Affordable Care Act, "an individual shall not, on the ground prohibited under … section 504 of the Rehabilitation Act of 1973, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance …." 42 U.S.C. § 18116(a).

### 3. Summary Judgment Standard

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law'" and "'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The burden on the moving party may be discharged by demonstrating 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 4. Analysis

The defendants do not dispute that they are subject to the non-discrimination provisions of the ADA, Rehabilitation Act, Affordable Care Act, and Wisconsin law. Moreover, the "[d]efendants do not dispute that plaintiff is a qualified individual with a disability." (ECF No. 38 at 20.)

#### 4.1. Duplicative Claims

With respect to Juech's claims of discrimination, Children's Hospital does not materially distinguish between Juech's various causes of action. It tends to focus on the ADA and Rehabilitation Act claims and refers to them interchangeably. It argues that Juech must choose only one of her claims because they are all duplicative. (ECF No. 38 at 19-20.) And it is true that, because the elements of a claim under the ADA and under the Rehabilitation Act are largely coextensive (with the exception of the additional element of receipt of federal funds under the Rehabilitation Act, which no one disputes is satisfied here), the Court of Appeals for the Seventh Circuit has said that a court would not err in dismissing one of the two claims. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671-72 (7th Cir. 2012). Moreover, interpretative caselaw is generally interchangeable between the two Acts. *Lacy v. Cook Cty.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018) (citing *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999)).

But just because it would not be err for the court to dismiss one or more of Juech's claims does not mean it is required to do so. The court is not persuaded that Juech must choose between her claims, at least not at this stage of the litigation. The court finds it unnecessary to belabor the distinctions between the scope of relief available under the various statutes. It is sufficient to note that, as even the defendants acknowledge, one statute might afford relief not available under a related law. (*Cf.* ECF No. 38 at 25-27 (discussing availability of punitive damages under Wisconsin law).) Any concern that the pursuit of similar claims might lead to impermissible duplicative recoveries may be addressed before trial or through appropriate jury instructions. Therefore, the court rejects the defendants' request to force Juech to choose a single claim.

### 4.2. Discrimination

Whether the auxiliary aids provided by a hospital were appropriate "is inherently fact-intensive." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342-43 (11th Cir. 2012) (citing *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (finding that whether a sign language interpreter was required under the Rehabilitation Act is a question of fact inappropriate for summary judgment); *Duffy v. Riveland*, 98 F.3d 447, 454-56 (9th Cir. 1996) (concluding that whether a qualified sign language interpreter was required

under the ADA is a question of fact inappropriate for summary judgment)). Of course, that is not to say that the question is never appropriate for summary judgment. *Id.*

At this stage, the court must view the evidence in the light most favorable to Juech. *See Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). At first blush, it would appear disputes of material fact clearly preclude summary judgment. After all, Juech disputes nearly all of Children's Hospital's proposed findings of fact. But her disputes are generally based upon empty rote objections, such as that the proposed fact is "immaterial, vague, and misleading." As to her own proposed facts, they are often derived from her own deposition testimony, which itself is often inconsistent, marked by significant gaps in her memory, and sometimes not based upon personal knowledge.

Although Juech is, at times, arguably hyperbolic in her testimony regarding the extent of the problems, the court accepts that a reasonable finder of fact could conclude that it sometimes took "several minutes" (ECF No. 51, ¶ 121)—"probably five minutes" (ECF No. 47-1 at 13)—for hospital staff to connect the VRI, and that the VRI would freeze and pixilate (ECF No. 51, ¶ 121).

Notwithstanding Juech's preference for and expectation that Children's Hospital provide her with an in-person interpreter at all times, it was not required to do so as long as it could provide effective alternative means of communicating with her. *See* 28 C.F.R. § 36.303(c)(ii); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017) (quoting *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1147 (11th Cir. 2014))

("The regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded."). "[C]onstruing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid." *Silva*, 856 F.3d at 836 (quoting *Liese*, 701 F.3d at 343). A VRI is an acceptable auxiliary aid, *see* 28 C.F.R. § 36.303(b)(i), even in a medical context, as Juech's extensive successful experience with them demonstrates (ECF No. 47-1 at 9). Moreover, written communication may be acceptable, especially for routine matters. *See* 28 C.F.R. § 36.303(b)(i).

The court also rejects Juech's implication that any temporary failure of or complication with the VRI amounts to discrimination. Technology is imperfect, and the Department of Justice undoubtedly appreciated as much when it adopted the relevant regulations approving VRI as a means for providing a qualified interpreter. Delays and difficulties in initiating the VRI do not necessarily amount to discrimination. In approving the use of friends or family to facilitate communication under certain circumstances when an interpreter is not available, the Department of Justice's regulations implicitly acknowledge that an interpreter might not be immediately available. *See* 28 C.F.R. § 36.303(c)(3), (4). Given that it could be expected that it might take some time for an interpreter to arrive at the location where her services are needed (*see* ECF No. 47-2 at 19 (Juech's testimony discussing the need to schedule interpreters a month or two weeks in advance because "it takes a while to set up interpreters" and

"It's too hard to get an interpreter at the last minute"), a delay in obtaining and starting up the VRI does not necessarily constitute discrimination.

Nor does a finding of discrimination necessarily follow simply from the fact that a hospital tries to use an auxiliary aid that proves ineffective. For example, a hospital may attempt to communicate through written notes only to find that the issue being discussed is too complex for written notes. That does not, in hindsight, render the attempt discriminatory. Only if the hospital failed to provide an alternative auxiliary aid once it became clear that the initial method of communication was ineffective might there be a claim for discrimination.

On the other side, the court rejects Children's Hospital's argument that the fact that hospital staff were able to obtain relevant medical information from Juech demonstrates that the hospital was able to effectively communicate with her. Effective communication is a two-way exchange. That hospital personnel were able to get the information they needed from Juech does not establish that Juech was able to get the information she needed from them.

Nor does the court find that Juech is required to identify "medically relevant information" that was not effectively communicated. Children's Hospital's reliance on "medically relevant information" comes from *Silva*, 856 F.3d at 829, where the court held that "the relevant inquiry is whether the hospitals' failure to offer an appropriate

auxiliary aid impaired the patient's ability to exchange medically relevant information with hospital staff."

Children's Hospital reads *Silva* as limiting the scope of the ADA to the exchange of "medically relevant information," but the ADA is broader than that. In fact, rather than limiting the scope of the ADA, the court in *Silva* was clarifying that the district court's overly narrow view of the ADA was improper. Specifically, the court took issue with the district court's conclusion that summary judgment was appropriate because the plaintiffs were able to "convey the primary symptoms, a treatment plan, and discharge instructions." *Id.* at 835. The court concluded that the ADA and the Rehabilitation Act afforded greater protection than that. It concluded that disabled persons are entitled to exchange all "medically relevant information" and not merely information about "primary symptoms, treatment plan, and discharge instructions." *Id.* at 835-36.

Ultimately, the court's focus at the summary judgment stage is whether evidence exists from which a reasonable finder of fact could conclude that Juech was denied the use of auxiliary aids necessary for effective communication. Rather than offering specific examples of instances where a particular problem with an auxiliary aid resulted in an inability to effectively communicate with hospital staff, Juech tends to offer vague and sweeping allegations. For example, she alleges broadly that she "had little to no understanding of her son's medical condition, the tests he underwent and the

medication he received, or the instructions for his follow-up care" (ECF No. 51, ¶ 135), and that "[i]n most instances, Alissa Jeuch was unable to engage in effective communication without the aid of a qualified ASL interpreter" (ECF No. 51, ¶ 136).

The only specific instance Juech has identified in her proposed findings of fact where she alleges the absence of an adequate auxiliary aid resulted in a lack of communication is the following: "At one point during B.J.'s medical treatment, a nurse administered an IV to B.J. without explaining its nature or purpose to Alissa Juech, who was forced to attempt to ask the nurse about the procedure afterwards using pen and paper; consequently, Alissa Juech was unable to give informed consent for that treatment." (ECF No. 51, ¶ 134.) In support of this proposed fact Juech cites to the following colloquy from her deposition: "Q: And I just want to be clear. You have no criticisms as to the medical care? A: I said no, they did a wonderful job caring for him, but I'm complaining about the nurse coming in, doing the IV, not communicating until after it happened, plus the interpreter issue and those problems. That's what I'm complaining about." (ECF No. 47-1 at 30.)

The proposed finding of fact misstates the evidence insofar as it suggests that a nurse placed an intravenous line without telling Juech what she was doing. Her complaint was not with the IV line being placed without explanation to her. Rather, her complaint relates to an incident in the pediatric intensive care unit "on the last day" when a nurse came in to B.J.'s room and began doing something with the IV line. Juech

used a pen and paper to ask the nurse what she was doing. (ECF No. 47-1 at 16.) According to Juech, the nurse wrote back, "Just cleaning it out, so that they could pull out the IV." (ECF No. 47-1 at 16.) In her deposition Juech elaborated:

> [A]    I never said the staff didn't really take care of my son well. I thought they did really good. I was happy with the staff. But my complaint was about one nurse also that came in to clean the IV area and didn't communicate with me. And I was like: Whoa, what's going on here. And so, you know, I have a complaint about that, you know, but I have the right to know about what's going on before they do the IV or remove it, because there could have been allergies or whatever. Well, let's say in some situation I may not approve it, so I'm his mother and I should have been able to approve that before they started such a thing.
>
> Q    And that was when the nurse withdrew the IV?
>
> A    Yes. And then inserted something to clean and then took it out.

(ECF No. 47-1 at 18.)

Although a strong argument can be made that the use of written notes to explain what the nurse was doing was an appropriate aid in this context, the court finds that is not a question it can appropriately resolve at summary judgment. That is, the court cannot conclude as a matter of law that using notes in this context was an appropriate auxiliary aid and that the failure to provide a different auxiliary aid, such as an in-person interpreter, did not discriminate against Juech.

The court also finds that, if a place of public accommodation provides a VRI that consistently results in "lags, choppy, blurry, or grainy images, or irregular pauses in communication," 28 C.F.R. § 36.303(f)(2), at some point it is no longer an isolated

technical glitch but instead amounts to discrimination if it results in ineffective communication. Otherwise, the Department of Justice's requirements for VRI, 28 C.F.R. § 36.303(f), would be meaningless. Certainly, not every isolated failure of the VRI violates the ADA. But consistent and persistent problems could lead a reasonable finder of fact to conclude that the VRI denied Juech effective communication.

By analogy, a telephone call might break-up temporarily, requiring a caller to repeat himself. Such hiccups do not materially impact the parties' ability to speak with each other. But at some point such problems can become so frustrating that the parties to the call would rather just hang up and talk later or communicate through email rather than carry on given the problems. If the problems Juech encountered with the VRI were of the latter degree—repeated and constant—it is plausible that Children's Hospital violated the ADA by refusing to provide her with an in-person interpreter. It is up to the finder of fact to determine whether the problems Juech allegedly encountered were sufficiently severe so as to render the VRI an ineffective means of communication.

### 4.3. Compensatory Damages / Deliberate Indifference

Juech seeks damages under the Rehabilitation Act for the defendants' alleged discrimination. At the time the parties submitted their briefs, the Court of Appeals for the Seventh Circuit had not yet determined the applicable standard a plaintiff must satisfy to obtain damages under section 504 of the Rehabilitation Act or Title II of the

ADA.[1] Relying on authority from other circuits, the parties both argued that the standard is one of deliberate indifference. (ECF Nos. 38 at 24; 45 at 25-28; 50 at 7.) "Deliberate indifference occurs when "the defendant *knew* that harm to a federally protected right was substantially likely and … *failed* to act on that likelihood." *Lacy*, 897 F.3d at 862 (quoting *Liese*, 701 F.3d at 344–45) (emphasis in original). "It is meant to identify indifference that is a 'deliberate choice.'" *Id.* (quoting *Liese*, 701 F.3d at 344–45).

The Court of Appeals for the Seventh Circuit subsequently agreed that deliberate indifference was the proper standard:

> [M]ost of our sister circuits have adopted deliberate indifference as the proper standard for obtaining compensatory damages under Title II [of the ADA] and section 504 [of the Rehabilitation Act]. … We now agree with the majority of courts that have spoken on the question and hold that a plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference. Specifically, we adopt the two-part standard applied by most other courts, 'requiring both (1) knowledge that a harm to a federally protected right is substantially likely,' and (2) a failure to act upon that likelihood."

*Id.* at 862-63 (quoting *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)) (internal quotation marks and footnote omitted); *see also Viera v. City of N.Y.*, 2018 U.S. Dist. LEXIS 169677, at *35-36 (S.D.N.Y. Sep. 30, 2018) ("a defendant acts with deliberate indifference where: (1) an official or 'policymaker' who — at a minimum — 'has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf,['] (2) has 'actual knowledge of discrimination' against an

---

[1] Juech's ADA claim comes under Title III, and only injunctive relief, not damages, is available under that Title of the ADA. *See Scherr v. Marriott Int'l*, 703 F.3d 1069, 1075 (7th Cir. 2013).

individual with a disability, and (3) 'fails [to] adequately respond'") (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275-76 (2d Cir. 2009)); *Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 815 (11th Cir. 2017) ("A defendant organization is deliberately indifferent under Section 504 if an official of the organization knows that harm to an individual's Section 504 rights is substantially likely and the official fails to act on that likelihood.").

According to Juech, a reasonable finder of fact could conclude that Children's Hospital was deliberately indifferent because it did not provide an in-person interpreter despite Juech's requests and despite its problems with the VRI. She relies heavily on *Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807 (11th Cir. 2017), an unpublished decision of the Court of Appeals for the Eleventh Circuit, to argue that the alleged repeated failures of the VRI support a finding of deliberate indifference. (ECF No. 45 at 25-26.) According to Juech, because the problems with the VRI were persistent, it would have been apparent to hospital staff that the VRI was ineffective. Thus, she argues, the fact that hospital staff still failed to provide an in-person interpreter despite these problems could lead a reasonable finder of fact to conclude that the defendants were deliberately indifferent. (ECF No. 45 at 26.)

However, at her deposition she testified that the hospital staff tried to work with her to find solutions to any problems she was having communicating with them. Asked

if she believed Children's Hospital intentionally discriminated against her because she was deaf, Juech responded:

> I would not say the staff, because they did try to help me find things that would, you know, benefit me for communication. But I do believe that the administration is discriminating because they told me -- the staff did tell me that administrative [sic] did not want to pay for a live interpreter, and that's wrong.

(ECF No. 47-1 at 19.) Thus, she blamed the hospital administration, not the staff, for her communication problems.

But her assertion that hospital administration "did not want to pay for a live interpreter" appears to be based entirely on impermissible hearsay. She recounts: "I asked for a live in-person interpreter and they brought the VRI and I said please bring in a live interpreter again, and they said that the hospital will not be paying for a live interpreter, so that I had to use the VRI, and I was continuously fighting for that, that an interpreter in person would be there." (ECF No. 47-1 at 11.) Asked how she knew this, she explained, "The nursing staff told my mother, and my mom interpreted to me and let me know that." (ECF No. 47-1 at 11.) Although Juech characterizes her mother as interpreting what the nursing staff said, she acknowledges that the statement was made to her mother, not to her. But the court was not presented with any testimony from Juech or her mother as to whether her mother was actually interpreting—that is, relating verbatim something medical staff told Juech (which would not be hearsay)—or simply relaying to Juech what she heard, perhaps with her own inferences and

characterizations, which would make the statement hearsay. And the fact that Juech's mother is not fluent in sign language (ECF No. 47-1 at 18) certainly makes it less likely that the information Juech got from her mother was as a result of verbatim translation.

But even if hospital administrators did require the use of the VRI over an in-person interpreter, that by itself would not constitute deliberate indifference. Only if the hospital administrators were aware of the alleged problems with the VRI but demanded its use anyway could a reasonable finder of fact conclude that the defendants were deliberately indifferent. Juech has not presented evidence to support such a conclusion.

At best, the evidence might support the conclusion that individual staff members encountered problems. But there is no evidence that would allow a reasonable finder of fact to conclude that the staff members regarded the problems as anything other than isolated incidents. Even if they viewed the problems as recurring and substantial, Juech has presented no evidence that they passed those views on to the hospital administrators that Juech complains discriminated against her.

*Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 816-18 (11th Cir. 2017), upon which Juech relies, is distinguishable in that there the hospital staff often deprived the deaf patient of *any* auxiliary aid, and when the VRI *was* used the staff recognized it was ineffective but refused to provide any other aid. Significantly, the court found no deliberate indifference with respect to certain plaintiffs because there was no evidence

that the employees knew the chosen aids—VRI and written notes—were likely to result in ineffective communication. *Sunderland*, 686 F. App'x at 818.

In short, the fact that Children's Hospital did not provide Juech with an in-person interpreter when she requested one does not, without more, suggest deliberate indifference. *See Liese*, 701 F.3d at 343 ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights …."). The court concludes that Juech has failed to present sufficient evidence from which a reasonable finder of fact could conclude that any discrimination was the result of deliberate indifference. Therefore, Children's Hospital is entitled to summary judgment regarding Juech's claim for damages under the Rehabilitation Act.

### 4.4. Injunctive Relief

With respect to her ADA claim, Juech seeks injunctive relief. Specifically, she contends that she "lives near Children's (the hospital in her area dedicated to the treatment of children), visited Children's prior to the visits subject to this lawsuit, and is often referred to Children's by her children's pediatrician." (ECF No. 45 at 30.) "As a result, it is likely that [she] will continue to visit Children's in the future." (*Id*.) Thus, Juech contends, her injury is ongoing and properly redressable through injunctive relief. (*Id*. at 30-31.)

For a federal court to have jurisdiction under Article III of the Constitution "the plaintiff must show (1) injury in fact, which must be concrete and particularized, and

actual and imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) redress-ability." *Scherr v. Marriott Int'l*, 703 F.3d 1069, 1074 (7th Cir. 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "[T]he Supreme Court has held that 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects.'" *Id.* (quoting *Lujan*, 504 U.S. at 564) (brackets and ellipses omitted).

It is not enough that a plaintiff professes an intent to some day return to the place where she allegedly suffered discrimination. *Scherr*, 703 F.3d at 1074 (quoting *Lujan*, 504 U.S. at 564) "Such 'some day' intentions—without any description of concrete plans, or indeed even any specifications of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* (quoting *Lujan*, 504 U.S. at 564).

The court takes judicial notice of the fact that Children's Hospital is not the nearest hospital to Juech's home. She testified that she lives in Cudahy, Wisconsin. (ECF No. 47-1 at 9.) There are roughly a half-dozen hospitals closer to her home than Children's Hospital. And Juech has taken her children to other hospitals. (*See, e.g.*, ECF

No. 48-2 at 7, 8-9.) But, of course, Children's Hospital is the hospital in the area that specializes in the care of children.

As for the fact that her pediatrician refers her to Children's Hospital, it is unclear if Juech is describing Children's Hospital in the broad sense, which would encompass its clinics and specialists, or if she is referring to the emergency department specifically. As the defendants note, the discrimination she allegedly suffered occurred only during her visits to the emergency department and during the related admission of her children to the hospital. At her deposition she testified that when she attended pre-scheduled appointments at Children's Hospital she did not encounter any alleged discrimination. (ECF No. 47-1 at 19). (It is true that, in a second deposition two years later, Juech testified that she believed Children's Hospital *did* discriminate against her on other occasions by providing her VRI instead of an in-person interpreter, but she could not remember any instance (ECF No. 47-2 at 22).) Consequently, the court agrees with the defendants that the relevant inquiry is not Juech's likelihood of returning to any Children's Hospital facility, but the likelihood that she will return to the emergency department or have a child admitted to Children's Hospital.

One way to demonstrate the likelihood of returning to a defendant hospital is through an established pattern. *See Sunderland*, 686 F. App'x at 819; *see also Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) ("it is … reasonable to infer, based on the past frequency of her visits and the proximity of defendants' restaurants to her home,

that Camarillo intends to return to these restaurants in the future"). Thus, in *Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807 (11th Cir. 2017), the court found that one plaintiff had standing to seek injunctive relief because she had been visiting the hospital for annual screenings for the past three years. *Id.* at 819. However, the other plaintiffs lacked standing because, although they all suffered from "medical conditions that could at any time require them to visit a hospital," their conditions were stable. *Id.* at 819.

In *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135 (11th Cir. 2014), the court found that the plaintiff lacked standing to pursue a claim against a hospital because, although he suffered from a serious medical condition that resulted in a 20-day hospitalization, there was no medical evidence that the condition was likely to result in future hospitalizations. *Id.* at 1145-46. The court noted that the plaintiff had not returned to the defendant hospitals during the pendency of the litigation. *Id.* at 1146. Moreover, the court noted that the alleged problems were unlikely to recur because the hospitals had policies addressing the relevant issues. *Id.*

In *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824 (11th Cir. 2017), each of the plaintiffs asserted, "Due to many factors, including the location of my doctors, the fact that Defendants have all of my medical records and history, the proximity to my home, and history of prior care/treatment, it is likely I will visit and receive treatment at Defendants' hospitals." *Id.* at 832. The court accepted these assertions and found that the plaintiffs had standing to pursue injunctive relief. *Id.*

Assessing whether Juech's expressed intentions are sufficiently concrete to convey standing is made difficult given the nature of emergency room visits and hospital admissions. No one plans to seek emergency care at a hospital. The need tends to arise unexpectedly. When it does arise, a wide variety of factors affect which hospital a person might choose to visit. Similarly, aside from those with certain chronic health conditions or a known need, people generally cannot anticipate whether they will be admitted to a hospital.

The fact that Juech did return to Children's Hospital during the pendency of this lawsuit (and again allegedly suffered discrimination) tends to support her contention that she may return in the future. Having said that, there is no evidence that Juech's children suffer from any medical condition such that they are especially likely to need future emergency care or hospitalization.

Is essence, Juech's claim of standing boils down to this: she lives in the Milwaukee area, has children, and, if those children unexpectedly need emergency medical care or hospitalization, there is a possibility, based in part upon the fact that she has done so in the past, that she will seek care at Children's Hospital instead of at one of the closer hospitals to which she has also taken her children before. That is an insufficiently "real and immediate" threat, *see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)), to bestow standing on Juech to pursue injunctive relief.

The fact that she *could* return to Children's Hospital is insufficient. *See Hummel*, 817 F.3d at 1017. There is no evidence that Juech has any specific plans to return to Children's Hospital's emergency department or to have a child admitted to the hospital, unlike the plaintiff in *Scherr v. Marriott Int'l*, 703 F.3d 1069, 1074-75 (7th Cir. 2013). In *Scherr*, because the plaintiff had many family members residing near the defendant hotel, she was likely to return to the area to visit them (and would need to stay in a hotel). In fact, she pointed specifically to an upcoming family wedding. *See id.* at 1074-75.

In contrast, Juech does not point to any upcoming event that creates a concrete and particularized likelihood that her return to Children's emergency department, or that a need for one of her children to be hospitalized there, is actual and imminent. Juech offers only the barest speculation that she will have such a need. Such speculation is insufficient to convey standing. Therefore, Children's Hospital is entitled to summary judgment with respect to this aspect of its claim.

### 5. Conclusion

A reasonable finder of fact could conclude that Juech was subject to discrimination under the ADA and the Rehabilitation Act. However, no reasonable finder of fact could find that this alleged discrimination was the result of deliberate indifference. Therefore, Juech's Rehabilitation Act claim fails. Although Juech argues that she may still pursue nominal damages, she offers no relevant authority for that

proposition. Instead, she cites only *Farrar v. Hobby*, 506 U.S. 103 (1992), which held that a plaintiff who obtains only nominal damages in a suit under 42 U.S.C. §§ 1983 and 1985 is a prevailing party under 42 U.S.C. § 1988. *Id.* at 112. It made no reference to the Rehabilitation Act.

Juech's claim under Title III of the ADA also fails because she has failed to demonstrate that she has standing to pursue injunctive relief. The mere possibility that one of her children will at some point in the future need emergency care or hospitalization, and that Juech will seek that care at Children's Hospital rather than at any of the other hospitals closer to her home, does not constitute a sufficiently real and immediate threat of future injury to establish standing to seek injunctive relief.

The parties do not specifically address Juech's claim under the ACA. But because it derives from the Rehabilitation Act, Juech's ACA claim must fail for the same reasons as her Rehabilitation Act claim does.

That leaves only Juech's state law claim, which, again, the parties do not specifically address other than with respect to the question of punitive damages. Having dismissed all of the federal claims over which the court has jurisdiction, the court declines to exercise jurisdiction over her remaining state law claim. *See* 28 U.S.C. § 1367(c)(3); *O'Neill v. Gourmet Sys. of Minn., Inc.*, 213 F. Supp. 2d 1012, 1022 (W.D. Wis. 2002).

**IT IS THEREFORE ORDERED** that the motion for summary judgment filed by Children's Hospital and Health System, Inc. and Children's Hospital of Wisconsin is granted with respect to Claims 1 (Americans with Disabilities Act), 2 (Section 504 of the Rehabilitation Act), and 4 (Patient Protection and Affordable Care Act) of Alissa Juech's amended complaint. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Claim 3 of Alissa Juech's amended complaint (Wis. Stat. § 106.52) is **dismissed without prejudice** pursuant to 28 U.S.C. § 1367(c)(3).

**IT IS FURTHER ORDERED** that the plaintiff's motions in limine (ECF Nos. 34, 35) are **dismissed as moot**.

Dated at Milwaukee, Wisconsin this 2nd day of November, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge